# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| TOTAL QUALITY LOGISTICS, LLC, | : | Case No. 1:19-cv-23 |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| WILLIAM J. RIFFE, *et al.*, | : | |
| Defendants. | : | |

## ORDER GRANTING PLAINTIFF'S RENEWED MOTION
## FOR PRELIMINARY INJUNCTION (Doc. 28)

This civil case is before the Court on Plaintiff's renewed motion for preliminary injunction (Doc. 28) and the parties' responsive memoranda (Docs. 36, 42, 43).

## I. BACKGROUND

Plaintiff Total Quality Logistics ("TQL")'s renewed motion for preliminary injunction seeks to enjoin former employee, William "Ross" Riffe, from further violating the terms of his "Employee Non-Compete, Confidentiality, and Non-Solicitation Agreement" ("Non-Compete Agreement"), and seeks to prohibit Defendants Del Mar Packing, LLC, Del Mar Farms (collectively "Del Mar"), and Hustle Logistics, LLC ("Hustle") from misappropriating TQL's trade secrets and tortiously interfering with TQL's contractual relationship with Riffe. (Doc. 28).

TQL is an Ohio limited liability company with its principal place of business in Cincinnati, Ohio. (Doc. 2 at ¶ 14). TQL provides freight brokering and third-party logistics services to customers in the continental United States. (*Id.* at ¶ 3). Riffe, a

Kentucky resident, was employed by TQL from January 9, 2012 until he voluntarily terminated his employment on July 6, 2018. (*Id.* at ¶¶ 3, 6, 15, 32). While at TQL, Riffe held several job titles, including Logistics Account Executive Trainee ("Broker Trainee"), Logistics Account Executive ("Broker"), and Sales Group Leader. (*Id.* at ¶ 3). During his time at TQL, Riffe participated in a training program (provided to all Broker Trainees) on topics including TQL's services, pricing structure, sales strategies, customers, and general operations. (*Id.* at ¶ 4). Riffe's work exposed him to TQL's trade secrets and confidential information, such as financial records, terms of business dealings, and customer lists. (*Id.* at ¶¶ 5, 36). While at TQL, Riffe had extensive contact with TQL customer, Del Mar, whose point of contact was Brian Wright. (*Id.* at ¶ 5).

When Riffe began his employment with TQL in 2012, he signed a Non-Compete Agreement, which contains the following one-year restrictive covenant:

> Employee will not directly or indirectly, own, operate, maintain, consult with, be employed by (including self-employment), engage in, or have any other interest (whether as an owner, shareholder, officer, director, partner, member employee, joint venturer, beneficiary, independent contractor, agent, or any other interest) in any Competing Business (as defined below), except the ownership of less than 1 % of the outstanding equity securities of any publicly-held corporation or entity; and
>
> Employee will not directly or indirectly, either as an employee, agent, consultant, contractor, officer, owner, or in any other capacity or manner whatsoever, whether or not for compensation, participate in any transportation-intermediary business that provides services in the Continental United States, including but not limited to any person or organization that provides shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management services . . .

(*Id.* at 23-24 ¶ 9(b)(i)-(ii)). The Agreement defines the term "Competing Business" as "any person, firm, corporation, or entity that is engaged in shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management services in the Continental United States." (*Id.* at 25 ¶ 9(f)). The Agreement also prohibits Riffe from soliciting any TQL customers or motor carriers, taking action to divert business from TQL, interfering with or attempting to disrupt TQL's relationships, or soliciting TQL employees or former employees. (*Id.* at 24 ¶ 9(b)(iii)-(v)). Moreover, the Agreement protects against disclosure of TQL's confidential information, with Riffe agreeing not to use or disclose confidential information to any individual or business other than TQL, and to return confidential information in his possession upon termination of employment. (*Id.* at 22 ¶¶ 5-6, 24 ¶ 9(c)).

After Riffe left TQL, he began working for Del Mar, a TQL customer. (*Id.* at ¶¶ 5-6). Plaintiff's complaint alleges that shortly after Riffe's departure, TQL noticed a sharp decline in business generated by Del Mar and at least one other TQL customer. (*Id.* at ¶¶ 7, 49). TQL later learned that Del Mar had begun using the brokering services of a new, California limited liability company—"Hustle"—formed by TQL's contact at Del Mar, Brian Wright. (*Id.* at ¶¶ 8, 20, 51). TQL's complaint notes that Hustle received brokerage authority from the Federal Motor Carrier Safety Administration (FMCSA) sixteen days after Riffe left TQL. (*Id.* at ¶ 51). The complaint also alleges that Hustle's website lists the same phone and fax numbers as Del Mar, and that Brian Wright is listed as the registrant for Hustle on the California Secretary of State's website. (*Id.* at ¶ 52). In addition, TQL alleges that Wright is listed as Hustle's manager in a 2018 Statement of

3

Information form. (*Id.* at ¶ 53). Based on these facts, TQL asserts that Riffe assisted in forming Hustle, a direct competitor of TQL, by using TQL's confidential information and trade secrets, and solicited TQL's customers, including Del Mar. (*Id.* at ¶ 56). Further, TQL alleges that Riffe is actually working for both Del Mar *and* Hustle, in a position that is substantially similar to his position as a broker for TQL. (*Id.* at ¶ 57). The complaint seeks injunctive relief based on a breach of contract claim asserted against Riffe for violating his Non-Compete Agreement (Count II) (*Id.* at ¶¶ 66-70), and also seeks injunctive relief based on claims asserted against Del Mar and Hustle for tortious interference with a contract and violation of the Ohio Uniform Trade Secrets Act, Ohio Revised Code § 1333.61, *et seq*. (Counts III-IV) (*Id.* at ¶¶ 71-82).

TQL filed its complaint in the Clermont County Court of Common Pleas, which entered a temporary restraining order in December 2018 (Doc. 1-1 at 128), prior to Defendants' removal of the case on January 8, 2019 (Doc. 1). After removing the case, Defendants filed a motion to dissolve the temporary restraining order. (Doc. 5). This Court denied the motion as moot, finding the restraining order had already expired. (Doc. 8). Then, on May 31, 2019, the Court set a case schedule, allowing for discovery and setting a deadline by which Plaintiff could renew its motion for preliminary injunction, originally filed in state court.

Now, in Plaintiff's renewed motion for preliminary injunction, TQL reasserts its prior request to enjoin Riffe from further violating his Non-Compete Agreement and to enjoin Del Mar and Hustle from misappropriating TQL's trade secrets and tortiously interfering with TQL's contractual relationship with Riffe. (Doc. 28).

## II. STANDARD OF REVIEW

Plaintiff bears the heavy burden of demonstrating its entitlement to injunctive relief. The purpose of a preliminary injunction is to preserve the status quo pending a final decision on the merits. *Louisiana-Pacific Corp. v. James Hardie Bldg. Prods.*, 928 F.3d 514, 517 (6th Cir. 2019) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). An "injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). Accordingly, Plaintiff must establish its case by "clear and convincing evidence." *Ohio A. Phillip Randolf Inst. v. Husted*, 350 F. Supp. 3d 662, 670 (S.D. Ohio 2018) (citing *Damon's Rests., Inc. v. Eileen K. Inc.*, 461 F. Supp. 2d 607, 621 (S.D. Ohio 2006)). In other words, Plaintiff's evidence must "more than outweigh the [opposing] evidence" and must "persuade the court that its claims are highly probable." *Id.*

Nevertheless, Plaintiff need not "prove [its] case in full." *Total Quality Logistics, LLC v. III's Hotshot, Inc.*, No. 1:17-cv-352, 2017 WL 5972001, at *2 (S.D. Ohio Dec. 1, 2017) (citing *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007)). "[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.* (quoting *Northeast Ohio Coalition v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012)).

In determining whether to grant injunctive relief, courts weigh the following four factors: "(1) whether the movant has a strong likelihood of success on the merits;

(2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of an injunction." *Louisiana-Pacific Corp.*, 928 F.3d at 517. When a plaintiff shows *some* likelihood of success on the merits, a court should balance these factors rather than tally them. *Id.* (citing *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017)). Although no one factor is controlling, "a court must not issue a preliminary injunction where the movant presents no likelihood of merits success." *Id.*; *Gonzales v. Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

### III. ANALYSIS

#### A. Likelihood of Success on the Merits

##### a. Claims against Riffe

Plaintiff's renewed motion for preliminary injunction seeks to enjoin Riffe from further violating his Non-Compete Agreement with TQL, specifically alleging that Riffe breached the Agreement by leaving TQL to work for Del Mar and Hustle, soliciting TQL customers, and sharing TQL's confidential information and trade secrets. (Doc. 28 at 26-27). In short, TQL argues that Hustle, the brokerage firm created by Del Mar employee, Brian Wright, is not a distinct entity, but rather, an in-house freight brokerage for Del Mar. (Doc. 28 at 21-22). Thus, TQL argues that although Riffe purports to work as a sales assistant for TQL customer, Del Mar, he is in reality, working as a broker for Hustle—a direct competitor—in violation of his Non-Compete Agreement. (*Id.*). TQL's evidence supporting this theory consists of discussions between Riffe and Wright leading

up to Riffe's departure from TQL, e-mails Wright sent to both Riffe and two Hustle employees, as well as certain facts showing the interconnectedness of Hustle and Del Mar. (*Id.* at 11-19).

For example, in his deposition, Riffe testified that he began discussing the possibility of leaving TQL for Del Mar with Wright in spring of 2018. (Riffe Depo. at 43). Wright was also considering starting his own brokerage firm around the same time. (Wight Depo. at 85). Wright was admittedly aware of Riffe's non-compete Agreement. (*Id.*). He forwarded a copy of Riffe's Non-Compete Agreement to an attorney-acquaintance for review who advised that Riffe was "pretty well screwed," as the Agreement "[c]over[ed] just about every single option," including the possibility of Riffe working for Wright "in-house" so long as he was "engaged in the role of managing or arranging 'transportation.'" (Wright Depo. at 160-162).

A few weeks before Riffe left TQL for Del Mar, Wright sent Riffe a text message asking him "[are] [y]ou ready for July 2nd?" to which Riffe responded that he was, "[n]ervous but still ready to make some dang money." (Doc. 43 at 1). One week later, Wright texted Riffe again telling him, "mark your calendar" for July 2nd. (Doc. 28 at 12). Riffe responded by asking "are we ready?" -- to which Wright replied that he had "cash in the bank, Surety bond, BOC 3 form, DOT #, MC #, **And the best broker in the business**." (Doc. 28 at 12; Riffe Depo. at 141) (emphasis added). TQL asserts that this conversation was in refence to Wright's formation of Hustle, which Riffe would be joining. (Doc. 28 at 12).

7

TQL also points to e-mails sent from Wright to both Riffe and Hustle employees Scott Campbell and Heriberto Hernandez during Riffe's employment at Del Mar. (Doc. 28 at 16). One such exchange involved coordinating a shipment of cantaloupe to an end customer. (Riffe Depo. at 62-73). During his deposition, Riffe explained that his role as a sales assistant would have been to stay apprised of the source of the fruit and the sale price. (Riffe Depo. at 71-72). Wright also forwarded an e-mail from a TQL customer asking if he wanted "to handle freight?" to Hernandez, Campbell, and Riffe. (Riffe Depo. at 76). Wright's e-mail message asked for "rates and redemption," which Riffe understood to be asking, in part, for shipping rates. (Riffe Depo. at 76-78). Riffe later testified that it was not unusual to receive e-mails about types of produce and case counts. (Riffe Depo. at 84).

TQL further asserts that when Riffe left TQL, he took home everything from his desk, including statistics related to loads, sales, and on-time deliveries TQL had generated for Del Mar, orientation materials, training materials, and notebooks full of notes taken over the course of Riffe's employment at TQL. (Riffe Depo. at 118-136). Riffe stated in an affidavit that he put the materials in a spare room of his home and did not touch them for a year. (Doc. 42 at 4). Riffe has since returned the materials. (*Id.*).

To demonstrate the interconnectedness of Del Mar and Hustle, Plaintiff points out that the Del Mar website refers visitors to contact Anthony Wright, Scott Campbell, and Heriberto Hernandez. These three plus Riffe constitute the entirety of Del Mar Packing's sales team that Brian Wright oversees. (Wright Depo. at 42-43). Wright testified in his deposition that he started the brokerage firm Hustle, with the help of Campbell and

8

Hernandez. (Wright Depo. at 113, 129). Wright is the sole member of Hustle and is listed as the registrant of Hustle on the California Secretary of State's website. (Wright Depo. at 134). Wright has both a Hustle and Del Mar e-mail address. (Wright Depo. at 48, 115-16). Prior to the instant litigation, Hustle's website listed the same phone and fax numbers as Del Mar Packing, though the numbers have since changed. (Wright Depo. at 65-66, 71). Hustle does not pay for any employee benefits, nor does it separately pay for internet, utilities, or rent. (Wright Depo. at 119-21). Wright testified that Hernandez and Campbell regularly broker on behalf of Hustle from Del Mar's address in Patterson, California (Wright Depo at 118), although Hustle is working on getting its own space (Wright Aff. at ¶ 6). Wright testified in his deposition that neither Campbell nor Hernandez had any brokering experience prior to Wright's formation of Hustle. (Wright Depo. at 70-71, 113). Wright stated that he learned how to start a brokerage from a free PowerPoint presentation available on "DAT.com," but did not undergo any other training. (*Id.* at 92, 113).

Riffe described his job duties as a sales assistant with Del Mar as assisting with daily sales by helping to process invoicing and perform other basic accounting tasks, conduct inventory management, research market pricing for fruit sales, and manage rejected fruit shipments. (Riffe Aff. ¶ 8; Wright Aff. ¶ 17). However, the job duties were not formalized, and at one point in his deposition, Wright stated that "[t]he responsibilities of a salesperson in the produce industry" sometimes involve "arrang[ing] freight for a customer," responding in the affirmative when specifically asked if Riffe "does that." (Wright Depo. at 164).

9

Based on the facts above, the Court finds that Plaintiff has demonstrated a high probability that Riffe has breached his Non-Compete Agreement. To reiterate, Riffe's Agreement with TQL prohibits him from "participat[ing] in any transportation-intermediary business that provides services in the Continental United States" either "directly or indirectly" as an employee, consultant, or otherwise, with or without compensation for a one-year period. (Doc. 2 at 23-24 ¶ 9(b)(i)-(ii)). Thus, although Plaintiff goes to great lengths attempting to show that Hustle and Del Mar are "alter-egos" or "sister corporations," that analysis is not necessary to a finding that Riff breached the Agreement.

Defendant Wright argues that it would be unjust to enforce the non-compete against Riffe simply because his boss started a competing company, with certain overlapping employees and a shared address and phone number. (Doc. 42 at 7). However, that is not what Plaintiff is asking the Court to do here. The significant circumstantial evidence, most notably the timing of Riffe's departure and TQL's decline in business from Del Mar, the fact that Hustle's two brokers had no prior experience, Riffe's close working relationship with both Hustle employees (as demonstrated by the e-mail chains), and Riffe's lead-up text-messages with Wright demonstrate a high probability that Riffe was performing services as a broker for Hustle and/or Del Mar, or at least *consulting* with Hustle and/or Del Mar regarding the brokering of freight. *Cf. Polymet Corp. v. Newman*, No. 1:16-cv-734, 2016 WL 4449641, at *4 (S.D. Ohio Aug. 24, 2016) (finding likelihood of success on the merits as to trade secrets violation based

on circumstantial evidence, including employee's plans to form competitor prior to leaving company).

Moreover, the same circumstantial evidence supports a finding that Riffe used his knowledge of TQL's confidential information and trade secrets, especially regarding its business with Del Mar, to assist Hustle and/or Del Mar in brokering freight. The circumstantial evidence as to the allegation that Riffe has solicited clients consists of the fact that several of Hustle's clients happen to be former TQL clients. This evidence is weaker than that supporting Plaintiff's other breach of contract claims, considering Wright's plausible assertion that he already had contacts with Hustle's clients through his work for Del Mar. Regardless, while Plaintiff may need to show more to succeed on the merits, at this stage, the circumstantial evidence summarized above is sufficient to show a strong likelihood that Riffe breached his Non-Compete Agreement with TQL.

As a final note, Defendants do not challenge, generally, the reasonableness of Riffe's Non-Compete Agreement. Courts have upheld as enforceable similar TQL non-compete agreements with one-year restrictive periods, while modifying the scope of agreements to the *trucking* brokerage industry. *See e.g.*, *Total Quality Logistics, LLC v. OTC Logistics LLC*, No. 1:19-cv-151, 2019 WL 1300223, at *3-4 (S.D. Ohio Mar. 21, 2019). Thus, Riffe's Agreement would likely be found reasonable with the same modification, limiting the Agreement's restrictions to Riffe's participation in the truck brokering industry only.

Riffe separately asserts that at this point, his one-year Non-Compete Agreement has expired. (Doc. 42 at 2). Riffe is correct that over one year has passed since he left

his position at TQL on July 6, 2018. (Doc. 2 at ¶ 6). However, a non-compete agreement cannot expire while its enforceability is being litigated. *OTC Logistics*, 2019 WL 1300223, at *5 (citing *Rogers v. Runfola & Assocs. Inc.*, 565 N.E.2d 540, 544 (Ohio 1991)). Instead, the agreement is equitably tolled to afford the litigants the benefit of their bargain. *Id.* Further, when a court finds a violation of a non-compete agreement that has elapsed, the court can choose to extend the agreement for a period it deems appropriate. *III's Hotshot, Inc.*, 2017 WL 5972001 at *5. Here, Plaintiff initiated the lawsuit to enforce the Agreement prior to its expiration; thus, the one-year period is equitably tolled. The Agreement remains in effect for the time being and may be extended by the Court if Plaintiff ultimately wins on the merits.

  b. **Claims against Hustle and Del Mar**

Plaintiff's renewed motion for preliminary injunction also asserts claims against Hustle and Del Mar for allegedly interfering with Riffe's Agreement and for misappropriating TQL's trade secrets in violation of the Ohio Uniform Trade Secrets Act, Revised Code § 1333.61, *et seq.* (Doc. 28 at 27-28).

In Ohio, to establish a claim of tortious interference with a contract or business relationship, a plaintiff must show: (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) an intentional and improper act by the tortfeasor interfering with the contractual or business relationship, (4) a lack of privilege on the part of the tortfeasor, and (5) resulting damages. *AK Steel Corp. v. Miskovich*, No. 1:14-cv-174, 2014 WL 11881030, at *6 (S.D. Ohio Mar. 3, 2014) (citing *Clark v. Christ Hosp.*, No. C-060342, 2007 WL 2404143, at *3 (Ohio Ct. App. Aug. 24, 2007)). Here,

Del Mar employee and Hustle founder, Brian Wright, discussed with Riffe the possibility of him joining Del Mar. Wright was aware of Riffe's non-compete and consulted with an attorney-acquaintance regarding its scope who advised that the Agreement precluded Riffe from brokering freight for Wright, even in-house. (Wright Depo. at 160-162). Nevertheless, Wright proceeded to offer Riffe a job at Del Mar, and based on the circumstantial evidence summarized above, there is a substantial likelihood that Riffe began assisting Del Mar and/or Hustle broker freight in violation of the Agreement. Accordingly, TQL has demonstrated a substantial likelihood that Del Mar and/or Hustle, through the actions of Wright, tortiously interfered with Riffe's Non-Compete Agreement, resulting in a loss of business.

Under the Ohio Uniform Trade Secrets Act, "actual or *threatened* misappropriation" may be enjoined. R.C. § 1333.62(A) (emphasis added). To succeed on a claim under this statute, a plaintiff must demonstrate the following by a preponderance of the evidence: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret. *MEMC Elec. Materials, Inc. v. Balakrishnan*, No. 2:12-cv-344, 2012 WL 3962905, at *6 (S.D. Ohio Sept. 11, 2012) (citing *Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008)). Further, under the inevitable disclosure doctrine, a threatened misappropriation of trade secrets can be shown by "facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially

13

similar to the position held during the former employment." *Polymet*, 2016 WL 4449641, at *4 (citing *Proctor & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 279 (Ohio Ct. App. 2000)).

Although TQL has not presented direct evidence that Riffe shared trade secrets with either Del Mar or Hustle, Plaintiff has demonstrated that Riffe received extensive training as a broker during his time at TQL and possessed an intimate knowledge of TQL's business, having been exposed to confidential information, including customer lists and TQL's rate matrix. (Riffe Depo. at 22, 54). In addition, on his last day, Riffe took with him statistics related to loads, sales, and on-time deliveries, as well as TQL's Sales Training Playbook and other training and orientation materials. (Doc. 28 at 13). Regardless of whether Riffe was technically employed by Del Mar or Hustle, the accumulated circumstantial evidence demonstrates a high probability that Riffe was helping to broker freight by employing the knowledge he obtained working at TQL. It is not a stretch to assume that Riffe shared this knowledge with Wright and the two other Del Mar/Hustle employees with whom he worked, Hernandez and Campbell. As such, TQL has succeeded in demonstrating a high likelihood of success as to its trade secret misappropriation claim against Hustle and Del Mar.

**B.     Irreparable Harm**

The second factor is whether Plaintiff will suffer irreparable harm absent injunctive relief. *Louisiana-Pacific Corp.*, 305 F.3d at 517. In order to demonstrate that the resulting harm would be irreparable, Plaintiff must show that it "will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen,*

*Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). Harm is irreparable if it cannot be fully compensated by monetary damages. *Overstreet*, 305 F.3d at 578. Such harm may come in the form of a loss of customer goodwill and fair competition. *See also AK Steel Corp.*, 2014 WL 11881030, at *5. Moreover, the Supreme Court of Ohio has held that injunctive relief is the appropriate remedy in cases involving misappropriation of a former employer's trade secrets. *Valco Cincinnati, Inc. v. N & D Mahining Serv., Inc.*, 492 N.E.2d 814, 819 (Ohio 1986).

TQL asserts that without a preliminary injunction, it will continue to suffer from lost sales and a loss of customer goodwill due to Del Mar, Hustle, and Riffe's continued use of TQL's trade secrets and confidential information. (Doc. 28 at 30). Mark Bostwick, TQL's risk manager, states in his declaration that in November 2018, he investigated a sharp decline in billing from Del Mar, and upon further investigation, learned that Hustle is now brokering freight for Del Mar and several other TQL customers. (Doc. 28-1 at ¶¶ 8-9). Considering the Court's finding that Riffe was likely assisting Hustle and/or Del Mar engage in freight brokering using confidential information he obtained during his time at TQL, as well as the nature of the alleged harm (loss of business and customer goodwill), the Court finds that Plaintiff has adequately demonstrated that irreparable harm would ensue absent a preliminary injunction.

## C.    Harm to Others

The third factor in the preliminary injunction analysis is whether granting the injunctive relief would harm the party enjoined or other non-parties. Consequently, the Court must balance the irreparable injury the Plaintiff would suffer if its motion for

15

injunctive relief is denied against any harm which would be suffered by others, including Riffe, Del Mar, and Hustle, as a result of granting the injunction. *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).

Defendants Del Mar and Hustle argue that Plaintiff's request for a preliminary injunction enjoining Riffe from further violating his Non-Compete Agreement and enjoining Del Mar and Hustle from misappropriating TQL's trade secrets and interfering with TQL's contractual relationship with Riffe is vague, making it difficult to determine the extent of the harm Defendants would suffer were the Court to issue the preliminary injunction. (Doc. 36 at 19). However, an appropriately-tailored preliminary injunction would allay Defendants' concerns by providing clarity and minimizing harm to the Del Mar and Hustle.

Based on the scope of Riffe's Non-Compete Agreement and with the facts presently before the Court, should the injunction issue, the Court finds that Riffe could continue his employment with Del Mar as a *sales assistant*, so long as he is not brokering freight or consulting with Hustle or Del Mar regarding brokering freight. Riffe would also not be permitted to solicit TQL customers or share his knowledge of TQL's trade secrets and confidential information. Therefore, the harm to Riffe, in particular, resulting from a preliminary injunction would not be substantial. Moreover, Del Mar and Hustle could continue business as usual, as long as they are not using Riffe to broker freight or using TQL trade secrets gained from Riffe to gain an unfair competitive advantage.

On the other hand, the potential harm to TQL by allowing Riffe to continue violating his Non-Compete Agreement by brokering freight and soliciting TQL clients

16

for Del Mar and/or Hustle is significant. TQL has already experienced a decline in business from certain customers following Riffe's departure, which are now using Hustle instead. Accordingly, the potential irreparable harm to TQL in the absence of a preliminary injunction outweighs the potential harm to each of the Defendants. Thus, this factor also weighs in favor of granting the preliminary injunction.

**D.     Public Interest**

The final factor courts consider is whether granting the injunction would affect the public interest. Under Ohio law, "[p]reserving the sanctity of contractual relations and preventing unfair competition have traditionally been in the public interest." *OTC Logistics LLC*, 2019 WL 1300223, at *5 (quoting *UZ Eng'red Prods. Co. v. Midwest Motor Supply Co., Inc.*, 770 N.E.2d 1608, 1081 (Ohio Ct. App. 2001)). A preliminary injunction in this case would serve those precise interests. Accordingly, this factor weighs in favor of granting injunctive relief.

In balancing the four factors pertaining to injunctive relief, especially considering the high probability of success on the merits, as well as the risk of irreparable harm, the Court finds that a preliminary injunction against Defendants Riffe, Del Mar, and Hustle is appropriate to preserve the status quo until this case is decided on the merits. The scope of the injunction is detailed below.

## IV.  CONCLUSION

Based upon the foregoing, Plaintiff's renewed motion for preliminary injunction (Doc. 28) is **GRANTED**. The following injunctive relief is put in place effective immediately:

1. Riffe is preliminarily enjoined from breaching his "Employee Non-Compete, Confidentiality, and Non-Solicitation Agreement" with TQL, dated January 9, 2012; specifically, Riffe is enjoined from (a) consulting with or being employed by Hustle Logistics, (b) participating in or assisting with freight brokering in his role as a sales assistant for Del Mar Packing, (c) soliciting TQL customers, and/or (d) disclosing TQL's confidential information and trade secrets; and

2. Hustle Logistics, Del Mar Packing, LLC, and Del Mar Farms are preliminarily enjoined from misappropriating TQL's trade secrets and from tortiously interfering with TQL's contractual relationship with Riffe by using his knowledge of TQL's trade secrets to broker freight.

3. Defendants need not post a bond.

**IT IS SO ORDERED.**

Date:  10/28/19

*Timothy S. Black*
Timothy S. Black
United States District Judge