**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION – CINCINNATI**

| | | |
|---|---|---|
| TOTAL QUALITY LOGISTICS, LLC, | : | Case No. 1:19-cv-23 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| RIFFE, et al, | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

**OPINION AND ORDER**

---

This matter is before the Court on cross motions for summary judgment. Each party filed respective motions for summary judgment (Docs. 61 & 63), which are each fully briefed and ripe for review (*see* Docs. 73, 74, 76 & 77). For the reasons provided below, Plaintiff's Motion is **DENIED** and Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART**.

**FACTS**

This action revolves around the question of whether Defendant William Riffe ("Riffe"), through his employment relationship with Del Mar Packing LLC ("Del Mar Packing") and alleged relationship with Hustle Logistics ("Hustle"), violated his Employee Non-Compete, Confidentiality, and Non-Solicitation Agreement ("NCA") with Plaintiff Total Quality Logistics, LLC ("TQL"). TQL contends that Defendants' conduct was improper in multiple ways, asserting claims of: breach of contract, seeking

monetary damages against Riffe; breach of contract, seeking injunctive relief against Riffe; tortious interference with a contract against Del Mar Farms, Del Mar Farms Partners LTD ("Del Mar Partners"), Del Mar Packing, and Hustle (the "Entity Defendants"), seeking monetary damages; violation of the Ohio Uniform Trade Secrets Act ("OUTSA") against Del Mar Farms, Del Mar Partners and Hustle seeking injunctive relief; and civil conspiracy against all Defendants seeking monetary damages.

## I.    The Parties

TQL is an Ohio limited liability company with its principal place of business in Cincinnati, OH. (Complaint ("Compl."), Doc. 2, Pg. ID 155.) It is "a national leader in the logistics industry, providing shipping services, third-party logistics services, freight brokerage services, truck brokerage services, and assistance with supply-chain management across the continental United States." (Marc Bostwick Declaration in Support of TQL's Renewed Motion for a Preliminary Injunction ("Bostwick Dec."), Doc. 28-1, Pg. ID 2399.) Simply put, TQL is hired by customers to ship goods from one location to another across the United States. (*Id.*) "TQL engages and coordinates independent carriers that are able and willing to haul freight at the times and places required by TQL's customers." (*Id.*) At TQL, the freight brokers are the primary point of contact between the company and TQL's customers. (*Id.*)

Riffe was employed at TQL between January 9, 2012 and July 6, 2018. (*Id.* at Pg. ID 2400.) First, he was employed as a Broker Trainee; however, after an extensive training program, Riffe was promoted to Broker and, later, Sales Group Leader. (Compl., Doc. 2, Pg. ID 157; Riffe Ans., Doc. 10, Pg. ID 361.) "As a Broker, Riffe was required to manage

2

relationships with TQL's existing customers and to develop relationships with prospective customers." (Compl., Doc. 2, Pg. ID 158; Riffe Ans., Doc. 10, Pg. ID 362.) Additionally, as a Broker, Riffe "had access to and became intimately familiar with TQL's trade secrets and confidential information." (*Id*.) Upon leaving TQL, Riffe was employed by Del Mar Packing as a sales assistant. (William Riffe Deposition ("Riffe Dep."), Doc. 27, Pg. ID 2050.)

Del Mar Farms is a California general partnership. (Defendants Del Mar Farms, Del Mar Packing, and Del Mar Partners Answers to TQL's First Set of Discovery Requests ("Entity Defendants Answers to Discovery Requests"), Ex. D. to Deposition of Brian Wright ("Wright Dep."), Doc. 26-1, Pg. ID 1939.) Jon Maring and Lee Del Don are the partners. (*Id*.) Del Mar Farms' general business has been identified as farming. (Wright Dep., Doc. 26, Pg. ID 1770.) However, Del Mar Farms identified no current employees apart from its two founding partners. (Entity Defendants Answers to Discovery Requests, Doc. 26-1, Pg. ID 1939-40, 1953.) Its physical address is in Patterson, California. (Wright Dep., Doc. 26, Pg. ID 1780.) Additionally, Del Mar Farms maintains a mailing address in Westley, California. (*Id*.)

Del Mar Packing "was established in 2012 as a California LLC owned by JFT Family Partnership and LAT Family Trust. JFT Family Partnership is managed by Jon Maring and LAT is managed by Lee Del Don." (Entity Defendants Answers to Discovery Requests, Doc. 26-1, Pg. ID 1939.) Del Mar Packing has approximately 90 employees, the majority of which are categorized as general farm labor. (*Id*. at Pg. ID 1939-40, 1953.) Del Mar Packing share their physical and mailing address with Del Mar Farms. (Wright Dep.,

3

Doc. 26, Pg. ID 1780.)

Hustle is a California limited liability company that provides freight brokerage and third-party logistics services. (Brian Wright Affidavit in Support of Defendants' Motion for Summary Judgment ("Wright MSJ Aff."), Doc. 61-2, Pg. ID 4299.) Brian Wright ("Wright"), a former employee of Del Mar Farms and current employee of Del Mar Packing, formed Hustle in May of 2018 and is its sole member. (Hustle Answers to TQL's Discovery Requests, Wright Dep. Ex. G, Doc. 26-1, Pg. ID 1968.) Hustle was duly organized under the laws of the State of California on or about June 18, 2018. (Hustle's Secretary of State Statement of Information ("Statement of Information"), Doc. 2, Pg. ID 1777.)

Hustle originally employed two freight brokers, Scott Campbell ("Campbell") and Heriberto Hernandez ("Hernandez"), (*see id.*), who were also concurrently employed by Del Mar Packing. (Wright Dep., Doc. 26, Pg. ID 1808-09, 1812, 1816.) During the course of this litigation, however, Hernandez's employment with Hustle terminated and Campbell's employment with Del Mar Packing terminated. Currently, Hernandez solely works for Del Mar Packing and Campbell works solely for Hustle. (Wright MSJ Aff., Doc. 61-2, Pg. ID 4306-07.) Prior to working for Hustle, neither Wright, Campbell, nor Hernandez had freight brokerage experience. (Wright Dep., Doc. 26, Pg. ID 1816.) Wright, Hernandez, and Campbell regularly brokered on behalf of Hustle from Del Mar Farms' and Del Mar Packing's address. (*Id.* at Pg. ID 1864.) Hustle could previously be contacted by the same phone numbers and fax numbers as Del Mar Packing. (*Id.* at Pg. ID 1865.)

The factual record reveals few facts regarding Del Mar Partners, and those facts

show only that it is "a California Partnership, is unrelated to Del Mar Farms, Del Mar Packing, LLC, and the owners each." (*See* Responses to TQL's interrogatories by Del Mar Farms, Del Mar Packing, and Del Mar Partners; *see also* Entity Defendants Answers to Discovery Requests, Doc. 26-1, Pg. ID 1939-40.) Additionally, the record reveals that Del Mar Partners' principal place of business is in Malibu, California. (Notice of Removal, Doc. 1, Pg. ID 2.)

## II. Riffe's Employment with and Resignation from TQL

TQL hired Riffe as a Logistics Account Executive Trainee, or Broker Trainee, on January 9, 2012. (Compl., Doc. 2, Pg. ID 157; Riffe Ans., Doc. 10, Pg. ID 361.) Prior to working for TQL, Riffe had no experience brokering freight. (*Id.*) Riffe was ultimately promoted to Logistics Account Executive, or Broker, and Sales Group Leader. (*Id.*) During his time at TQL, Riffe had approximately forty to fifty different customers. (Riffe Dep., Doc. 27, Pg. ID 2066.) Generally, he would keep about ten to fifteen customers in his portfolio at a time. (*Id.* at Pg. ID 2066-67.) Del Mar Packing became Riffe's customer in 2013 and, for most of his career, was Riffe's best customer. (*Id.* at Pg. ID 2074, 2077.)

TQL requires all employees to execute an NCA. (Compl., Doc. 2, Pg. ID 157.) Riffe's NCA prohibited him from doing the following for one year after his departure from TQL:

> (i) . . . directly or indirectly[] own, operate, maintain, consult with, be employed by (including self-employment), engage in, or have any other interest (whether as an owner, shareholder, officer, director, partner, member, employee, joint venturer, beneficiary, independent contract, agent, or any other interest) in any Competing Business . . .; and

> (ii) . . . directly or indirectly, either as an employee, agent, consultant, contractor, officer, owner, or in any other capacity or manner whatsoever, whether or not for compensation, participate in any transportation-

intermediary business that provides services in the Continental United States, including but not limited to any person or organization that provides shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management services; and

(iii) . . . directly or indirectly[] solicit any Customer, motor Carrier, client, consultant, supplier, vendor, lessee, or lessor, or take any action to divert business from TQL . . .

(NCA, Doc. 2-1, Pg. ID 173.)

Riffe's NCA defines a Competing Business as "any person, firm, corporation, or entity that is engaged in shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management services in the Continental United States . . ." (*Id*. at Pg. ID 174.) Also, the NCA required that Riffe to, upon termination of employment, "immediately deliver to TQL all originals and all copies of all documents and other material obtained from or belonging to TQL . . . in [Riffe's] possession, custody or control, including but not limited to any TQL files, documents (including any containing customer information), computer data, or other media however stored, and [Riffe] will retain no copy of any such document, data or other materials." (*Id*. at Pg. ID 171-72.)

The NCA also prohibits Riffe from "disclos[ing] such trade secrets, Customer lists, Motor carrier lists, Load Management System, private processes, and other Confidential Information to any person, firm, corporation, association or other entity for any reason or purpose whatsoever . . ." (*Id*. at Pg. ID 173.) Lastly, the NCA forbids Riffe from "mak[ing] use of any such property for [Riffe's] own purpose or benefit of any person, firm, corporation, association, or entity other than TQL under any circumstance." (*Id*.)

During his time at TQL, Riffe was aware that TQL consistently sought to enforce

6

NCAs against former employees who allegedly breached the NCA. (Riffe Dep., Doc. 27, Pg. ID 2070.) Riffe was also aware, generally, of what documents TQL considered confidential. (*Id.* at Pg. ID 2093-94.) Specifically, certain TQL documents would state on the bottom of the page that the document was confidential or for TQL eyes only. (*Id.* at Pg. ID 2094.)

Riffe and Wright began discussing the possibility of Riffe leaving TQL to work for Del Mar Packing in March of 2018. (*Id.* at Pg. ID 2083.) Wright then sent Riffe a talent assessment. (Wright Dep., Doc. 26, Pg. ID 1885.) After taking the talent assessment, Riffe and Wright discussed the possibility of Wright starting a freight brokerage and logistics firm. (Riffe Dep., Doc. 27, Pg. ID 2084.) Riffe then informed Wright of his NCA (*Id.*) Wright approached a friend and licensed attorney in California regarding Riffe's NCA and the potential of the two starting a brokerage firm. (Email Exchange Between Wright and Patricio ("May 1st Patricio Email"), Wright Dep. Ex. Q, Doc. 26-2, Pg. ID 2031.)

On April 27, 2021, Wright emailed the attorney a link of what he identified as a TQL NCA he found on the internet. (*Id.* at Pg. ID 2032.) The attorney informed Wright that, based on Ohio law and the NCA Wright provided, "your guy is pretty well screwed." (May 1st Patricio Email, 26-2, Pg. ID 2031.) The attorney also informed Wright that the NCA "[c]overs just about every single option as far as solicitation, competitors, going to work for a customer, etc. Even the idea of [Riffe] going to work for you in-house is covered if he engaged in the role of managing or arranging 'transportation'.'" (*Id.*)

Then, on May 8, 2018, Wright sought advice over email from the same attorney regarding the formation of Hustle. (Email Exchange with Patricio on May 8th ("May 8th

Patricio Email Exchange"), Wright Dep. Ex. O, Doc. 26-2, Pg. ID 2029.) The attorney responded, asking "Who would be the members and is your new guy going to have ownership? Could create a few challenges and open up the entity to a lawsuit. Just my two cents." (*Id.*) Wright responded, stating "I am assuming it is best to no ownership [sic] in [TQL] rep until is [sic] non-compete is over and then given him the chance to buy in thereafter." (*Id.* at Pg. ID 2028.) The attorney informed Wright that waiting until Riffe's NCA term was over would be an option that would not violate the TQL NCA. (*Id.*)

Nevertheless, Wright continued discussing the formation of Hustle with Riffe. On June 21, Wright and Riffe exchanged text messages regarding Hustle. (Text Message Chain Between Riffe and Wright on June 21st ("June 21st Text Message Chain"), Wright Dep. Ex. S, Doc. 26-2, Pg. ID 2034.) Wright texted Riffe saying "Mark your calendar . . . July 2nd[.]" (*Id.*) Riffe responded "Are we ready?" to which Wright replied "Yup[.] Got cash in the bank[,] Surety bond[,] Boc 3 form[,] Dot #[,] Mc #[,] And the best broker in the business[.] What else can a guy ask for?" (*Id.*) Wright has since testified that he was referring to Riffe when he stated, "the best broker in the business." (Wright Dep., Doc. 26, Pg. ID 1915-16.) Riffe responded on June 21, 2018 that he needed two additional weeks. (June 21st Text Message Chain, Doc. 26-2, Pg. ID 2035.) On July 5, 2018, Riffe texted Wright saying "told the bosses that tomorrow is my last day. Doing things." (Text Message Chain Between Riffe and Wright on July 5th ("July 5th Text Message Chain"), Wright Dep. Ex. T, Doc. 26-2, Pg. ID 2036.) To which Wright replied, "Let's do it dawg[.]" (*Id.*)

Riffe's last day at TQL was July 6, 2018. (Riffe Dep., Doc. 27, Pg. ID 2133.) Riffe

8

informed his supervisor that he was leaving TQL to work for Del Mar Packing and his supervisor did not object. (*Id.* at Pg. ID 2127.) On July 5, 2018, Riffe took numerous documents and materials upon his resignation. (*Id.* at Pg. ID 2156.) Many of the documents were designated "confidential" by TQL. (*Id.* at Pg. ID 2094.) However, Riffe testified that he boxed the documents up upon his resignation, put them in his home, and did not look at them again until the time of Marc Bostwick's deposition. (*Id.* at Pg. ID 2155-57.)

### III.  Riffe, Del Mar Packing, and Hustle

Despite talking with Wright about starting with Hustle, upon leaving TQL, Riffe immediately began working for Del Mar Packing as a sales assistant. According to Riffe and Del Mar Packing, his job duties were as follows:

> . . . assists with daily sales, including helping to process invoicing and perform other basic accounting tasks; conducts inventory management; researches market pricing for fruit sales; and manages rejected fruit shipments, including handling re-consignments and payments from venders. He also maintains and builds sales business with the existing customer base; implements sales and service strategies to meet Del Mar Packing's goals and follows up with consigned product and scheduled delivery appointments; and ensures timely arrival of delivered Del Mar Packing.

(Entity Defendants Answers to Discovery Requests, Doc. 26-1, Pg. ID 1940-41.)

Riffe and Wright testified that, as a sales assistant with Del Mar Packing, Riffe was not involved in shipping or brokering freight for Del Mar Packing. (Wright Dep., Doc. 26, Pg. ID 1926; Riffe Dep. Ex. A Responses to TQL's Interrogatories ("Riffe Responses to Interrogatories"), Doc. 27-1, Pg. ID 2212.) Specifically, Riffe claims that he "does not provide outside shipping services, third-party logistics services, freight brokerage

9

services, truck brokerage services, and/or assistance with supply-chain management."
(Riffe Responses to Interrogatories, Doc. 27-1, Pg. ID 2212.)

Also, at this same time, Wright continued the process of forming Hustle. Wright
claims to have followed a PowerPoint presentation on the Department of Transportation
website to form Hustle and obtain the necessary freight brokerage firm licenses to legally
broker freight in California and the United States. (Wright Dep., Doc. 26, Pg. ID 1838-39.)

Despite the fact that Hustle has no employees with prior brokerage experience,
Hustle has been able to broker freight for Del Mar Packing and multiple other customers.
Hustle has even been able to expand beyond its initial customers. (*Id*. at Pg. ID 1862.)
Several of Hustle's customers "were confirmed TQL customers, at least two of which had
been active customers of Mr. Riffe while employed at and immediately prior his
resignation from TQL." (Bostwick Dec., Doc. 28-1, Pg. ID 2400.)

Since Riffe has been employed at Del Mar Packing, he has also been included on
multiple email chains between Wright, Campbell, and Hernandez regarding moving
freight for Hustle customers. (Riffe Dep. Ex. W, X, Y, & Z (collectively, "Riffe and Hustle
Email Chains"), Doc. 27-5, Pg. ID 2326-32.) Additionally, Riffe's phone records show that,
after leaving TQL, he regularly contacted motor carriers directly, at least four of which
he also used to ship freight while still at TQL. (*See* Riffe Phone Records, Doc. 62-3.)
Defendants' records confirm the use of the carriers Riffe used while at TQL to move
product on behalf of Del Mar Packing and Hustle. (*See* Microsoft Excel Sheets, Doc. 62-2.)
Despite this, Defendants adamantly claim that Riffe has no employment relationship with
Hustle, has never brokered freight for either Del Mar Packing or Hustle, and has never

provided either company with TQL confidential information or trade secrets.

### IV.   TQL's Internal Investigation

In the months following Riffe's departure from TQL, TQL noticed a decline in business from Del Mar Packing and other TQL customers who were Riffe's customers when he was with TQL. (Marc Bostwick Deposition ("Bostwick Dep."), Doc. 31, Pg. ID 2496.) Thus, Marc Bostwick ("Bostwick"), TQL's Risk Manager whose duties included conducting internal investigations into potential violations of NCAs (*Id.* at Pg. ID 2437-2438), began an internal investigation at TQL into this decline. (*Id.* at Pg. ID 2496.)

To begin his investigation, Bostwick "looked at the [Federal Motor Carrier Safety Administration] and [Department of Transportation]." (*Id.* at Pg. ID 2500.) Bostwick determined that a Del Mar entity had a Department of Transportation number, allowing the entity to broker freight in the United States. (*Id.*) However, Bostwick was unable to determine which Del Mar entity had a Department of Transportation number, because the entities all have the same address and telephone number. (*Id.*) He then cross referenced the information listed on the Department of Transportation website and determined that the DOT number was listed to the same address and phone number as Hustle. (*Id.* at Pg. ID 2501-02.) This number was also linked to a brokerage Motor Carrier number. (*Id.* at Pg. ID 2502.) Bostwick then looked at the Federal Motor Carrier Safety Administration website to determine when Hustle received its brokerage authority, which was only a few weeks after Riffe left TQL. (*Id.* at Pg. ID 2503.)

Bostwick also examined Hustle's website and found that Hustle's contact information was identical to Del Mar Packing. (*Id.*) He called the number listed on

Hustle's website, and receptionist answered stating that it was Del Mar. (*Id*. at Pg. ID 2510-11.) He informed the receptionist that he was trying to reach Hustle. (*Id*.) She informed him that he called the correct number and then transferred him to Campbell. (*Id*.)

Bostwick told Campbell he was potentially starting a company and was looking for a broker. (*Id*. at Pg. ID 2513.) Campbell informed Bostwick that Hustle had been in business since June of 2018 and that he and Hernandez had multiple years of experience brokering freight. (*Id*. at Pg. ID 2514-15.) Campbell then volunteered that "they had moved 500 loads for Del Mar and that they used to deal with TQL and that they had created the business to cut out TQL." (*Id*. at Pg. ID 2516-17.) Campbell also revealed the names of multiple other customers of Hustle, including prior customers of TQL. (*Id*. at Pg. ID 2516.) Bostwick then informed TQL's counsel of his findings. (*Id*. at Pg. ID 2519-20.) At the conclusion of Bostwick's investigation, TQL filed the lawsuit that is before this Court.

### V. Injunctive Relief

TQL filed this case originally in December of 2018 in the Common Pleas Court of Clermont County, Ohio. (Notice of Removal, Doc. 1, Pg. ID 1.) The state court initially issued a temporary restraining order on December 17, 2018, (Order Resolving Defendant's Motion to Dissolve, Doc. 8, Pg. ID 324), but after removal, the temporary restraining order expired on January 22, 2019. (*Id*. at Pg. ID 328.)

Thereafter, the parties engaged in initial discovery and, on August 30, 2019, TQL moved for a preliminary injunction. (*See* Motion for Preliminary Injunction, Doc. 28.) On

12

October 28, 2019, the initially assigned judge[1] granted TQL's motion for a preliminary

injunction. (*See* Order Granting Motion for Preliminary Injunction, Doc. 43.)

## LAW

Courts must grant summary judgment if the record "reveals that there is no

genuine issue as to any material fact and the moving party is entitled to a judgment as a

matter of law." *Laster v. City of Kalamazoo,* 746 F.3d 714, 726 (6th Cir. 2014) (citing Fed. R.

Civ. P. 56(c)). Once the movant has met its initial burden of showing that no genuine

issue of material fact remains, the nonmoving party must present "specific facts showing

that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248

(1986). To do so, the nonmovant must present "significant probative evidence . . . on

which a reasonable jury could return a verdict" in their favor. *Chappell v. City of

Cleveland,* 585 F.3d 901, 913 (6th Cir. 2009). The court "must view the facts and any

inferences that can be drawn from those facts . . . in the light most favorable to the

nonmoving party." *Keweenaw Bay Indian Comm. v. Rising,* 477 F.3d 881, 886 (6th Cir. 2007).

This requirement, however, does not mean that the court must find a factual dispute

where record evidence contradicts wholly unsupported allegations. "The 'mere

possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582

(6th Cir. 1992) (*citing Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). "If a

moving party fulfills its burden of demonstrating that no genuine issue of material fact

exists, the nonmoving party, to receive a trial, must present some significant probative

---

[1] This case was originally assigned to Judge Timothy S. Black and was transferred to the undersigned on
November 25, 2020. (Doc. 78.)

evidence creating a factual dispute." *Stratienko v. Cordis Corp.*, 429 F.3d 592, 597 (6th Cir. 2005).

**ANALYSIS**

I.     **Defendants' Personal Jurisdiction Defense is Without Merit Because They Waived It.**

The Entity Defendants first contend they are entitled to judgment because the Court lacks personal jurisdiction over the Entity Defendants. Pursuant to Fed. R. Civ. P. 12(h), "a party waives the right to contest personal jurisdiction by failing to raise the issue when making a responsive pleading or a general appearance." *Gerber v. Riordan*, 649 F.3d 514, 520 (6th Cir. 2011). Personal jurisdiction can be waived either explicitly or implicitly. *Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 905 (6th Cir. 2006). Such waiver occurs when "[t]he actions of the defendant . . . amount to a legal submission to the jurisdiction of the court, whether voluntary or not." *Id.* The question is whether the "submissions, appearances and filings [] give Plaintiff a reasonable expectation that Defendants will defend the suit on the merits or must cause the court to go to some effort that would be wasted if personal jurisdiction is later lacking." *Gerber*, 649 F.3d at 519 (quoting *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440 (7th Cir. 2010)). The Sixth Circuit has held that, "[u]nder Federal Rule of Civil Procedure 12(h), a party waives the right to contest personal jurisdiction by failing to raise the issue when making a responsive pleading or a general appearance." *Id.* at 520.

The Entity Defendants have waived their right to contest personal jurisdiction in this matter by appearing before the Court during the course of this entire litigation

without raising this issue. This matter was originally removed by Defendants on January 8, 2019. Since then, the Entity Defendants have had counsel enter an appearance before the Court, answered TQL's Complaint (Docs. 10, 11 & 12), taken and filed multiple depositions, opposed TQL's renewed Preliminary Injunction, jointly moved to continue pretrial deadlines, and moved to file documents under seal in this action. In short, they have actively participated in this litigation without once objecting to the Court's personal jurisdiction over them. Based on this conduct, the Court finds that TQL has a reasonable expectation that the Entity Defendants would defend the suit on the merits, as they have, in fact, been defending this lawsuit on the merits.

In addition, the Entity Defendants' appearances, submissions, and filings have caused the Court to entertain a motion for a preliminary injunction, motions for summary judgment, and additional, albeit less significant, motions. Therefore, the Entity Defendants have caused this Court to go to some effort that would be wasted if the Entity Defendants could now claim that personal jurisdiction is lacking.

Thus, the Entity Defendants have waived their personal jurisdiction defense, and the Court has personal jurisdiction over this action.

## II. Claims Against Del Mar Farms Partners, Ltd. Must Be Dismissed as a Matter of Law.

Defendants argue in their Motion for Summary Judgment that Del Mar Partners "is unrelated to Del Mar Farms, Del Mar Packing, the owners of each, the facts and allegations in this case, and should be dismissed." (Def. MSJ, Doc. 61, Pg. ID 4259). Defendants point to numerous places in the record to support that Del Mar Partners is,

in fact, unrelated to the other Del Mar entities, including Jon Maring's Affidavit in Support of Defendants' Motion for Summary Judgment and Defendants' Del Mar Packing, Del Mar Farms, and Del Mar Farms Partners answers to TQL's interrogatories to support this argument. (*See* Maring Aff. in Support of Def. MSJ, Doc. 61-1, Pg. ID 4296; Entity Defendants Answers to Discovery Requests, Doc. 26-1, Pg. ID 1939-40.) In response, TQL fails to make any argument or point to any place in the record that shows that Del Mar Partners is in any way related to the other Defendants or the factual allegations of this case. As a result, no genuine issue of material fact exists as to whether Del Mar Partners is related to this dispute. Therefore, all claims against Del Mar Partners must be dismissed.

### III. Genuine Issues of Material Fact Preclude Granting Summary Judgment For Either Party on TQL's Breach of Contract Claim.

TQL's breach of contract claims center on whether Riffe violated his NCA with TQL during his employment with Del Mar Packing and through his relationship with Hustle. TQL claims that Riffe violated the NCA in the following ways: (1) Riffe is performing transportation services at Del Mar Packing, (2) Riffe assisted in the formation of Hustle, a direct competitor of TQL, and (3) Riffe used or disclosed TQL confidential information for Del Mar Packing and Hustle's benefit. Defendants, on the other hand, argue that none of the above occurred, and thus they are entitled to judgment as a matter of law.

To establish a breach of contract claim under Ohio law, a plaintiff must show "by a preponderance of the evidence that (1) a contract existed, (2) the plaintiff fulfilled his

obligations, (3) the defendant failed to fulfill his obligations, and (4) damages resulted from this failure." *Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, 933 F. Supp. 2d 974, 994 (S.D. Ohio 2013) (quoting *Anzalaco v. Graber*, 970 N.E.2d 1143, 1148 (Ohio Ct. App. 2012)).

The parties appear to agree that Riffe did not violate his NCA solely by accepting a job with Del Mar Packing. Rather, the crux of the dispute turns on whether Riffe has performed transportation services for Del Mar Packing and was involved in the creation of Hustle as TQL claims. The Court finds genuine issues of material fact exist as to these issues, precluding summary judgment.

Although the sales assistant job description that both Riffe and Del Mar Packing point to does not include performing transportation services, (*see* Entity Defendants Answers to Discovery Requests, Doc. 26-1, Pg. ID 1940-41), and both Riffe and Wright testified that, as a sales assistant with Del Mar Packing, Riffe was not involved in shipping or brokering freight for Del Mar Packing, (Wright Dep., Doc. 26, Pg. ID 1926; Riffe Responses to Interrogatories, Doc. 27-1, Pg. ID 2212), TQL points to significant circumstantial evidence suggesting that Riffe was performing duties beyond the sales assistant role and into the transportation and shipping realm.

First, the progression and timing alone strongly suggest that Riffe was involved in Hustle and freight brokering for Del Mar Packing. Wright and Riffe began discussing the possibility of Riffe leaving TQL to work for Del Mar Packing in the spring of 2018. (Riffe Dep., Doc. 26, Pg. ID 2083.) Wright then had Riffe take a talent assessment in the spring of 2018, after which they discussed the possibility of Wright starting a freight brokerage

and logistics firm. (*See* Wright Dep., Doc. 26, Pg. ID 1885); (Riffe Dep., Doc. 27, Pg. ID 2084.) Riffe then informed Wright of his NCA, which caused Wright to obtain advice from an attorney, who indicated that Riffe would violate his NCA if he worked with Hustle. (May 1st Patricio Email, Doc. 26-2, Pg. ID 2031.)

Wright claims that he decided to form Hustle on his own accord and used publicly available sources to do so. (Wright Dep., Doc. 26, Pg. ID 1831.) And Defendants are correct—Riffe is not employed by Hustle. (Riffe Dep., Doc. 27, Pg. ID 2113.) But again, the timing regarding Hustle's formation is suspicious. Hustle's Statement of Information with the California Secretary of State was filed on June 18, 2018. (Statement of Information, Doc. 2, Pg. ID 177.) Three days later, Wright and Riffe exchanged text messages regarding the formation of Hustle, identifying a "go live" date in July. (June 21st Text Message Chain, Doc. 26-2, Pg. ID 2034) (Wright texted Riffe staying "Mark your calendar . . . July 2nd[.]") Riffe specifically inquired whether Wright had everything ready, at which time Wright identified all documents he had compiled as necessary for Hustle to open. Riffe communicated his timeline for exiting TQL, also in early July, to Wright. (June 21st Text Message Chain, Doc. 26-2, Pg. ID 2035; July 5th Text Message Chain, Doc. 26-2, Pg. ID 2036.) Wright confirmed their plans, whatever they were, were a go. (*See id.*) ("Let's do it dawg[.]")

After he left TQL, Riffe immediately began working for Del Mar Packing. Hustle, shortly thereafter, started brokering freight for Del Mar Packing and other customers— even though none of the Hustle employees at that time had any brokerage experience, nor had they received any training while at Hustle. (Wright Dep., Doc. 26, Pg. ID 1816-

17.)  And, Hustle's initial customers included Riffe's former customers at TQL.  (Marc Bostwick Dec. in Support of PI, Doc. 28-1, Pg. ID 2400.)

Furthermore, Hustle itself had significant and suspicious overlap with Del Mar Packing.  Both were located at the same address and utilized the same phone number. (Bostwick Dep., Doc. 31, Pg. ID 2501-02.) Indeed, Hustle hired Campbell and Hernandez as commission-based freight brokers. (Wright Dep., Doc. 26, Pg. ID 1811, 1817.) At that time, both worked in the sales division of Del Mar Packing. (*Id*. at Pg. ID 1788.)  Each continued to work at Del Mar Packing while also brokering freight for Hustle. (*Id*.)  And Wright himself, the only owner of Hustle, manages the sales division at Del Mar Packing—conveniently overseeing Riffe, who was also in the sales division. (*Id*. at Pg. ID 1787-88.)

Since Riffe has been employed at Del Mar Packing, he has also been included on multiple email chains between Wright, Campbell, and Hernandez regarding moving freight for Hustle customers. (Riffe and Hustle Email Chains, Doc. 27-5, Pg. ID 2326-32.) Additionally, Riffe's phone records show that, after leaving TQL, he regularly contacted motor carriers directly, at least four of which he also used to ship freight while still at TQL. (*See* Riffe Phone Records, Doc. 62-3.) Defendants' records confirm the use of the carriers Riffe has been in contact with to move product on behalf of Del Mar Packing and Hustle. (*See* Microsoft Excel Sheets, Doc. 62-2.)  As such, there remains a genuine issue of material fact as to whether Riffe breached the NCA, and this question must be decided by a jury.

Furthermore, there is a genuine issue of material fact as to whether Riffe breached

the NCA by using and/or disclosing TQL's trade secrets to either Del Mar Packing or Hustle. Although Wright testified that Riffe did not provide Wright, Del Mar Packing, or Hustle any of TQL trades secrets or confidential information, (*Id.* at Pg. ID 1921), the undisputed fact remains that Riffe took TQL confidential information before leaving TQL. While Riffe claims he never even viewed the materials that he took upon resigning from TQL between the day he took the materials home and the day of Marc Bostwick's deposition, (Riffe Dep., Doc. 27, Pg. ID 2156), the circumstantial evidence noted above raises a question of fact, and a jury must decide if it credits Riffe's testimony.

The above analysis clearly shows that TQL and Defendants paint two different pictures of the facts in this case—both of which could reasonably support each side, demonstrating the existence of a genuine issue of material fact as to whether Riffe has violated his NCA by (1) competing with TQL while employed by Del Mar Packing, (2) soliciting customers on behalf of Hustle, or (3) using or disclosing TQL trade secrets or confidential information to the benefit of the Defendants. Based on the above facts, a reasonable jury could find for either party on TQL's breach of contract claims. Neither party is entitled to summary judgment as a matter of law on TQL's breach of contract claims. [2]

---

[2] Because the Court finds that genuine issues of material fact exist as to whether Riffe breached his NCA, the Court need not address whether TQL suffered damages as a matter of law.

**IV.  Genuine Issues of Material Fact Preclude Granting Summary Judgment on TQL's Ohio Uniform Trade Secrets Act Claim.**

All parties contend that they are entitled to summary judgment as a matter of law on TQL's Ohio Uniform Trade Secrets Act ("OUTSA") claim. TQL argues it is entitled to damages and injunctive relief as a matter of law. Defendants argue that "TQL failed to present <u>direct</u> evidence that Riffe shared trade secrets with either Del Mar Packing or Hustle." (Def. MSJ, Doc. 61, Pg. ID 4287).

Defendants fail to argue, and thus concede, that the documents Riffe took with him from TQL upon his resignation constitute trade secrets pursuant to Ohio Rev. Code § 1333.61(D). Thus, the question is whether TQL's trade secrets were misappropriated. But because genuine issues of material fact exist as to whether Defendants misappropriated TQL trade secrets, neither party is entitled to summary judgment.

Misappropriation is defined by statute as any of the following:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;

(2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:

    (a) Used improper means to acquire knowledge of the trade secret;

    (b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

      (c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ohio Rev. Code § 1333.61(B).

Courts may consider circumstantial evidence to determine if a genuine issue of material fact exists in misappropriation of trade secrets cases. *See Stratienko*, 429 F.3d at 600-01. "[M]isappropriation and misuse can rarely be proved by convincing direct evidence." *Id.* at 600 (quoting *Eden Hannon & Co. v. Sumitomo Trust & Banking Co.*, 914 F.2d 556, 561 (4th Cir. 1990)). Thus, when plaintiffs like TQL are "[p]resented with defendants' witnesses who directly deny everything, plaintiffs are often required to construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what the plaintiffs allege happened did in fact take place." *Id.* at 601 (quotations omitted).

At every point throughout the litigation, Defendants testified that Riffe did not disclose TQL's trade secrets to Wright, Del Mar Packing, or Hustle. However, Defendants do admit that Riffe took numerous documents and materials, most which constitute trade secrets, upon his resignation. (*See* Riffe Dep., Doc. 27). And TQL points to several pieces of circumstantial evidence, as noted above, to establish that Riffe misappropriated TQL trade secrets, all demonstrating a reasonable conclusion that, without TQL trade secrets, Hustle would not have been formed or have been able to divert business from TQL. Indeed, despite the lack of prior experience or training by any employee of Hustle, Hustle has been able to provide freight brokering services for Del Mar Packing and multiple

other customers. (Bostwick Dec., Doc. 28-1, Pg. ID 2400). Conveniently, at least two of these customers were Riffe's customers when he was a freight broker at TQL. (*Id.*)

A genuine issue of material fact exists as to whether Riffe misappropriated TQL trade secrets. While Defendants have continuously claimed that Riffe never shared TQL trade secrets, TQL has provided substantial circumstantial evidence that gives the Court pause. Based on the evidence before the Court, a jury could reasonably interpret the facts in favor of both parties. Therefore, the Court cannot find that either party is entitled to summary judgment on TQL's OUTSA claim as a matter of law.

**V.      Statutory Preemption of TQL's Common Law Tort Claims.**

Defendants next argue that TQL's common law tort claims, tortious interference and civil conspiracy, are preempted by the OUTSA claim. OUTSA preempts "conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." Ohio Rev. Code § 1333.67(A). However, OUTSA does not preempt "(1) [c]ontractual remedies, whether or not based on misappropriation of a trade secret; (2) [o]ther civil remedies that are not based on misappropriation of a trade secret; (3) [c]riminal remedies . . . whether or not based on misappropriation of a trade secret." Ohio Rev. Code Ann. § 1333.67(B). Additionally, the Sixth Circuit has held that OUTSA "should be understood to preempt not only causes of action for misappropriation of trade secrets but also causes of action that are based in some way on misappropriation of trade secrets . . ." *Stolle Mach. Co., LLC v. RAM Precision Indus.*, 605 F. App'x 473, 484 (6th Cir. 2015).

"The test to determine whether a state law claim is displaced by OUTSA is to

determine whether the claims are no more than a restatement of the same operative facts that formed the basis of the plaintiff's statutory claim for trade secret misappropriation." *Id.* at 485. Thus, the question is: are the facts supporting the common law tort claim "solely dependent on the same operative facts" of the OUTSA claim? *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 940 (S.D. Ohio 2012). If so, then tort claim is preempted. *Id.* However, when the common law tort claim "has a factual basis independent from the facts establishing the OUSTA claim, the portion of the claim supported by an independent factual basis survives preemption." *Stolle Machinery*, 605 F. App'x at 485. Lastly, this Court has held that OUTSA also "preempts all [non-contractual] claims based on misappropriation of information even if that information does not rise to the level of a trade secret." *Miami Valley Mobile Health Services, Inc.*, 852 F. Supp. 2d at 940.

Defendants claim that the common law tort claims are dependent on the same operative facts as the OUTSA claim. TQL claims that Defendants' argument is a mischaracterization of the Complaint's factual allegations. Each of the common law tort claims are addressed in turn below.

### a. TQL's Tortious Interference Claim is not Preempted by Its OUTSA Claim.

Plaintiff's tortious interference claim has a factual basis independent from the facts establishing its OUTSA claim and thus is not preempted by its OUTSA claim. First, TQL's factual basis for its tortious interference claim is that "Del Mar and Hustle have purposefully and intentionally interfered with TQL's contractual relationship with Riffe

by employing or otherwise retaining him in a position in which Riffe is competitive with TQL and that has and will continue to cause Riffe to breach the Riffe NCA." (Compl., Doc. 2, Pg. ID 164.) On the contrary, TQL's factual basis for the OUTSA claim is that "Del Mar and Hustle acquired trade secrets and confidential information of TQL . . . from Riffe." (*Id.* at Pg. ID 165.) TQL also claims that "Del Mar and Hustle knew or had reason to know that the trade secrets they acquired were done so by improper means, particularly in light of Riffe's violations of the Riffe NCA." (*Id.*) Lastly, TQL claims that "Del Mar and Hustle have used TQL's trade secrets without the express or implied consent of TQL." (*Id.*)

TQL's tortious interference claim contains no factual allegations related to TQL trade secrets, or the misappropriation of confidential information. Rather, it is premised solely on Riffe being employed or retained by a TQL competitor in violation of Riffe's NCA. Thus, TQL's tortious interference claim is not preempted by its OUTSA claim.

### b. TQL's Civil Conspiracy Claim is Preempted in Part by Its OUTSA Claim.

TQL's civil conspiracy claim, on the other hand, contains facts that are both dependent and independent of the OUTSA claim's factual basis. TQL argues that its civil conspiracy claim, while involving the misappropriation of trade secrets, also rests on whether Riffe's involvement in forming Hustle and his involvement in soliciting TQL customers, and, thus, should survive. The Court agrees in part.

TQL's factual basis for its civil conspiracy claim rests on the fact that "Riffe maliciously combined and acted in concert with Del Mar and Hustle to injure TQL by

misappropriating trade secrets and confidential information, forming a direct competitor

with TQL, and soliciting customers of TQL." (*Id*. at Pg. ID 166). Again, TQL's factual basis

for the OUTSA claim is that: (1) "Del Mar and Hustle acquired trade secrets and

confidential information of TQL . . . from Riffe[,]" (2) that Riffe's acquisition of the trade

secrets and confidential information was through improper means, (3) that Del Mar

Packing and Hustle were aware that the trade secrets and confidential information were

obtained through improper means, and (4) that the trade secrets were used without

TQL's consent. (*Id*. at Pg. ID 165.)

In this instance, the Court finds the Northern District of Ohio's holding in *Office

Depot Inc. v. Impact Office Products, LLC*, 821 F.Supp.2d 912 (N.D. Ohio 2011), although not

binding, to be persuasive. In *Office Depot Inc.*, two former employees of Office Depot

resigned and began employment at a competitor of Office Depot, Impact Office Products.

*Id*. at 916. The employees both executed employment agreements while working for

Office Depot. *Id*. "Both of the [e]mployment [a]greements contained non-competition,

non-solicitation, and nondisclosure-of-confidential information provisions governing

post-employment behavior." *Id*. Office Depot brought various claims against the former

employees and Impact Office Products. *Id*. Of relevant note, Office Depot brought a

misappropriation of trade secrets against all defendants, pursuant to OUTSA, and a

tortious interference with a contract claim against Impact Office Products. *Id*. at 917.

The Northern District of Ohio determined that Office Depot's tortious interference

claim against the Impact Office Products was preempted by its OUTSA claim in part. *Id*.

at 921. The court determined that Office Depot's factual basis for its tortious interference

26

claim rested on a breach of both the confidentiality clause and the noncompete provision

of the employment agreements. *Id.* The court held that, because Office Depot's tortious

interference claim involved not only a breach of the confidentially clause but also the non-

compete provision, the claim was not a "restatement of the same operative facts" as the

OUTSA claim. *Id.* at 922. Thus, the court held that the OUTSA claim preempted the

tortious interference claim only as it related to the confidentiality clause. *Id.* The tortious

interference claim, as it related to the non-compete provision, survived. *Id.*

There is no question that part of TQL's civil conspiracy claim is based on the

misappropriation of trade secrets and confidential information. However, the additional

bases for the civil conspiracy claim include allegations regarding the formation of a direct

competitor with TQL and solicitation of TQL's customers. Those allegations involve an

independent factual basis. Like in *Office Depot*, the NCA contained both a confidentiality

clause and a non-compete clause. The NCA prohibited Riffe from "directly or indirectly

. . . participat[ing] in any transportation-intermediary business . . ." (NCA, Doc. 2, Pg. ID

173.) Additionally, the NCA barred the soliciting any TQL customers or taking any action

to divert business from TQL. Lastly, the NCA disallowed any employee from disclosing

TQL trade secrets.

Like in *Office Depot*, TQL's civil conspiracy claim includes the violation of the non-

compete provision of the NCA. Thus, there is an independent factual basis for TQL's civil

conspiracy claim separate from TQL's OUTSA claim that Del Mar Packing and Hustle

misappropriated trade secrets. Therefore, the OUTSA does not preempt TQL's civil

conspiracy claim in its entirety. The OUSTA claim preempts TQL's argument that the

Defendants' alleged misappropriation of trade secrets constitutes civil conspiracy. However, TQL's civil conspiracy claim based on Defendants' alleged formation of a competitor with TQL and solicitation of TQL customers survive.

**VI.    Genuine Issues of Material Fact Preclude Granting Summary Judgment of TQL's Tortious Interference Claim.**

TQL argues that it is entitled to summary judgment as a matter of law on its tortious interference claim because Del Mar Packing and Hustle intentionally procured the breach of Riffe's NCA. On the other hand, Defendants argue that they are entitled to summary judgment as a matter of law because there is no genuine issue of material fact as to whether Del Mar Packing or Hustle intentionally procured a breach of Riffe's NCA. Rather, Del Mar Packing and Hustle argue the record reflects that no such intentional procurement occurred. On the contrary, the Court finds that a genuine issue of material fact exists as to whether Del Mar Packing or Hustle intentionally procured a breach of Riffe's NCA. Thus, neither party is entitled to summary judgment as a matter of law.

"The claim for tortious interference with a contractual relationship requires proof of the following elements: (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 707 N.E.2d 853 (1999). "'Intentional procurement' refers to conduct that causes the third party to breach the contract, or that leaves the third party with no choice but to breach the contract." *Union of Needletrades, Indus. And Textile Emps. AFL-CIO v. Am. Capital Strategies, Ltd.*, 546 F. Supp. 2d 546, 560-61 (S.D. Ohio 2008). To satisfy the

intentional procurement prong, the plaintiff must show that "the actor . . . want[ed] the breach of contract, or [knew] that a breach of contract is substantially certain to result from the interference." *Id.* at 561.

Genuine issues of material fact exist as to whether Del Mar Packing or Hustle knew that a breach of Riffe's NCA was substantially certain to result from hiring Riffe. TQL points to the fact the Wright consulted with an attorney, and the attorney's resulting advice, regarding Riffe working for either Hustle or Del Mar as evidence supporting its contention. (Wright Dep., Doc. 26, Pg. ID 1897-98.) While the Court acknowledges that the attorney warned Wright that Riffe having ownership in or working for Hustle would violate Riffe's NCA, Riffe did not go to work for Hustle—he works for Del Mar Packing. As to Del Mar Packing, the attorney only warned Wright that Riffe would violate his NCA working for Del Mar Packing "if he engaged in the role of managing or arranging 'transportation.'" (May 1st Patricio Email, Doc. 26-2, Pg. ID 2031.) According to Wright, he followed the attorney's advice and did not offer Riffe ownership in or employment with Hustle. (Wright Dep., Doc. 26, Pg. ID 1910.) Instead, Wright hired Riffe as a sales assistant at Del Mar Packing. (*Id.* at Pg. ID 1788-89.)

While the parties dispute the scope of Riffe's job duties since being hired at Del Mar Packing, as the Court noted above, there is a question of fact as to what, in fact, Riffe's job duties have entailed since he left TQL. It follows, then, that a genuine issue of material fact exists as to whether Del Mar Packing and Hustle intentionally procured the breach of Riffe's NCA, as a jury must decide whether a breach actually occurred. Thus, the Court need not address the parties' additional arguments on TQL's tortious interference claim.

29

Neither party is entitled to summary judgment as a matter of law on TQL's tortious interference claim.

### VII. Defendants are Entitled to Summary Judgment on TQL's Civil Conspiracy Claim as a Matter of Law.

Both parties claim to be entitled to summary judgment on TQL's civil conspiracy claim as a matter of law. In support of the civil conspiracy claim, TQL pled that "Riffe maliciously combined and acted in concert with Del Mar Packing and Hustle to injure TQL by misappropriating trade secrets and confidential information, forming a direct competitor with TQL, and soliciting customers of TQL." (Compl., Doc. 2, Pg. ID 166.) However, because this Court determined that TQL's civil conspiracy claim based on misappropriating trade secrets and confidential information is preempted by its OUTSA claim, the Court need only to consider TQL's civil conspiracy claim as it relates to the allegations that Riffe, Del Mar Packing, and Hustle formed a direct competitor with TQL and solicited customers of TQL.

Under Ohio law, the elements of civil conspiracy are "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act." *Aetna Cas. And Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 534 (6th Cir. 2000). A plaintiff must show "an underlying unlawful act" to succeed on a civil conspiracy claim. *Gosden v. Louis*, 116 Ohio App.3d 195, 687 N.E.2d 481, 496 (Ohio Ct. App. 1996). "[A]n otherwise lawful act is not made unlawful merely because two or more persons have joined together to commit it in hopes of causing injury to the plaintiff, even if they succeed." *Id*. at 497.

This Court determined above that genuine issues of material fact exist as to whether Riffe was involved in the formation of Hustle and whether Riffe solicited TQL customers on Hustle's behalf, both in violation of his NCA. However, under Ohio law, "a breach of contract alone cannot survive as the underlying 'unlawful act' for civil conspiracy." *Maxey v. State Farm Fire and Cas. Co.*, 689 F. Supp. 2d 946, 954 (S.D. Ohio 2010) (citing *All Erection & Crane Rental Corp. v. Acordia Northwest, Inc.*, 162 F. App'x 554, 559 (6th Cir. 2006)). Here, whether Riffe was involved in the formation of Hustle or solicited TQL customers at best equates to a breach of contract. Because a breach of contract does not constitute an unlawful act for civil conspiracy, Defendants are entitled to summary judgment as a matter of law.

## VIII. Genuine Issues of Material Fact Preclude Granting Summary Judgment Based Upon the Alter Ego Theory of Liability, Injunctive Relief, Punitive Damages, and Attorneys Fees at This Stage in the Litigation.

Lastly, each party seeks summary judgment on whether TQL is entitled to punitive damages and attorneys fees. Additionally, TQL argues that it is entitled to permanent injunctive relief. TQL also argues that it is entitled to a finding that Del Mar Farms should be held liable under the theory of alter ego liability. Whether TQL is entitled to punitive damages, attorneys fees, or permanent injunctive relief rests on the determination of its breach of contract, OUTSA, and tortious interference claims. As does whether TQL should be able to pierce the corporate veil and hold Del Mar Farms liable for any damages. Because genuine issue of material fact precludes this Court from granting summary judgment in favor of TQL on the breach of contract, OUTSA, and tortious interference claims, the Court need not render a determination regarding alter ego

liability, injunctive relief, punitive damages, or attorneys fees.

## CONCLUSION

Based on the above analysis, the Court **DENIES** Plaintiff's Motion for Summary Judgment (Doc. 63) and **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment (Doc. 61) and orders the following:

(1) The Court **GRANTS** Defendant Del Mar Farms Partners, Ltd. Motion for Summary Judgment on Counts 3, 4, and 5 of Plaintiff's Complaint. Thus, Counts 3, 4, and 5 of Plaintiff's Complaint are **DISMISSED WITH PREJUDICE** as they relate to Del Mar Farms Partners, Ltd.

(2) The Court **DENIES** all Defendants' Motion for Summary Judgment on Count 1 of Plaintiff's Complaint relating to Plaintiff's claim of breach of contract seeking damages.

(3) The Court **DENIES** all Defendants' Motion for Summary Judgment on Count 2 of Plaintiff's Complaint relating to Plaintiff's claim of breach of contract seeking injunctive relief.

(4) The Court **DENIES** all Defendants' Motion for Summary Judgment on Count 3 of Plaintiff's Complaint relating to Plaintiff's claim of tortious interference with a contract.

(5) The Court **DENIES** all Defendants' Motion for Summary Judgment on Count 4 of Plaintiff's Complaint relating to Plaintiff's claim of a violation of the Ohio Uniform Trade Secrets Act.

(6) The Court **GRANTS** all Defendants' Motion for Summary Judgment on Count 5

of Plaintiff's Complaint relating to Plaintiff's claim of civil conspiracy. Thus, Count 5 is **DISMISSED WITH PREJUDICE**.

(7) This matter shall proceed on Counts 1 (breach of contract seeking damages) against Riffe, 2 (breach of contract seeking injunctive relief) against Riffe, 3 (tortious interference with a contract) against Del Mar Packing and Hustle, and 4 (violation of the Ohio Uniform Trade Secrets Act) against Del Mar Packing and Hustle.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND